Anthony M. Reinach v. Commissioner.
Reinach v. Commissioner
Docket No. 1140-64.
United States Tax Court
T.C. Memo 1965-288; 1965 Tax Ct. Memo LEXIS 42; 24 T.C.M. (CCH) 1605; T.C.M. (RIA) 65288; October 29, 1965
*42 Jerome Kamerman, for the petitioner. Charles M. Greenspan, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in the income tax of petitioner and Jacquelyn K. Reinach, his wife, for the calendar years 1956, 1959, and 1960 in the amounts of $24,706.08, $538.83, and $4,474.21, *43 respectively. The entire deficiency for the year 1956 results from the disallowance of a claimed net operating loss carryback to 1956 from 1959, which net operating loss carryback had been previously tentatively allowed. The issues for decision are: (1) Whether certain losses sustained by petitioner as a result of the purchase of stock to cover a short position occasioned by petitioner's broker, upon exercise of a call option which petitioner had written for stock he did not own, delivering the stock to the optionee for petitioner without requiring petitioner to replace immediately the stock when the option was exercised, were ordinary or capital losses, and if such losses were ordinary losses, were the losses sustained in 1959 when petitioner contracted for the purchase of the stock or in 1960 when the stock certificate was actually delivered to petitioner's broker. (2) Whether petitioner is entitled to claimed deductions for travel, entertainment, and business expenses during the years 1959 and 1960 in the amounts of $12,193.40 and $11,410.27, respectively, and for salaries paid during 1960 in the amount of $6,520.54. (3) Whether respondent is barred from asserting a deficiency *44 for 1956 because of an agreement entered into between petitioner and respondent for that year. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner, an individual residing in New York, New York, filed joint Federal income tax returns with his wife, Jacquelyn K. Reinach, for the calendar years 1956, 1959, and 1960 with the district director of internal revenue for the Manhattan District of New York. From 1946 until March 29, 1956, petitioner was a partner in the firm of Ira Haupt & Co., [1] which was engaged in the securities business. Petitioner's father was a partner in Ira Haupt & Co. from at least 1940 until January 27, 1960, the date of his death. While petitioner was with the firm of Ira Haupt & Co., he had a variety of duties including research and statistical work, as well as dealing with customers. Commencing about April 1, 1956, petitioner rented an office at 730 Fifth Avenue, New York, New York at a rental of $275 *45 per month. He occupied this office from April 1, 1956 to December 19, 1958, paying the same rental during the entire time. Commencing about April 1, 1956, petitioner employed a secretary at a salary of $75 a week and continued to employ a secretary at this rate of compensation until December 31, 1958. Petitioner subscribed to a stock advisory service during 1956, 1957, and 1958 at costs of $1,085.43, $1,987.27, and $981.81, respectively. During 1956, 1957, and 1958, petitioner maintained telephone services at his office on Fifth Avenue and also had a telephone answering service, and for these services in these years paid the respective amounts of $891.74, $859.39 and $841.76. In 1956 petitioner furnished his office at 730 Fifth Avenue at a cost of approximately $4,100. About the time he opened his office on Fifth Avenue on April 1, 1956, petitioner started writing stock options. A "stock option" in the securities market is a negotiable contract paid for in advance, in which the holder has the right to buy (in the case of a "call" contract) or sell (in the case of a "put" contract) a specified number of shares of stock (generally 100) at a fixed price (normally the market price at *46 the time the contract is made) at any time within the period covered by the contract (usually 30, 60, or 90 days or 6 months). A "put and call writer" is the individual who agrees to sell stock on or before a specific future date, at a specified price, if he issues a "call" or to buy stock on or before a specific future date, at a specified price if he issues a "put." The exercise of the option can be made at any time during the option period but no later than 15 minutes before the close of Stock Exchange trading on the last day of the option period. In the case of a "call," the holder of the "call" contract is entitled to buy the specified stock from the writer at the agreed upon price as reduced by any dividends declared payable to the stockholders of record between the day the option is written and the exercise thereof. The adjusted price is sometimes referred to as the "striking price." From March 29, 1956, through August 7, 1958, petitioner wrote 412 option contracts, the expiration date of the last of which was in March 1959. Petitioner wrote no "puts" or "calls" after August 7, 1958. Petitioner, upon opening his office, let put and call brokers as well as regular stock *47 brokers know that he was available to write put and call options. He had a number of private telephone lines to put and call brokers and at one time a private line to a stock broker in his office, which lines were paid for by the various brokers. During the years 1956 through 1958 petitioner was solicited by put and call brokers to write put and call options and also at times he would call brokers and offer to write certain options. When a broker telephoned petitioner giving him the terms of an option that he desired to have written, petitioner would note the terms and would then consider whether or not in his opinion he would write the option. If he considered the option "a good piece of business," he would proceed to write it and if he did not consider it "a good piece of business," he would turn it down. Petitioner kept a daily calendar on his desk and whenever a transaction was closed between him and a put and call broker, he would make a note on the calendar of the terms of the transaction. Both petitioner and his secretary spent a good portion of each day answering telephone requests for petitioner to write options. Petitioner's put and call options were written on the standard *48 put and call option forms prepared by the members of the Put and Call Brokers and Dealers Association, Inc. Petitioner was not a member of this association. These forms called for the put and call option to be guaranteed by a member of the New York Stock Exchange. Petitioner's put and call option contracts were endorsed by Ira Haupt & Co., who also acted as petitioner's broker and with whom petitioner kept a running account. Petitioner would be paid a premium for writing a "put" or "call" option. At about the time petitioner would sell an option, he would notify Ira Haupt & Co. Shortly thereafter petitioner would receive a letter from Ira Haupt & Co., which in the case where the option was a "call" would state in substance that in accordance with his instructions Ira Haupt & Co. had endorsed for his account and risk a call on a stated number of shares of a stated stock, giving the date of the contract, the price of the stock, and the expiration date of the contract. The letter would also note that petitioner's account had been credited with a stated sum, which sum would be the premium received by petitioner for writing the contract. A similar letter stating the contract price and *49 expiration date of the contract and the amount of premiums credited to petitioner's account would be sent to petitioner by Ira Haupt & Co., upon endorsement by that company of a "put" option. When petitioner received these letters from Ira Haupt & Co., he compared them with the notations on his daily calendar to make sure there was no discrepancy, and if he found none, he would cross off the transaction on his calendar and enter it on a ledger. He would then file the letter from Ira Haupt & Co. Subsequently, petitioner would enter on the ledger the disposition of the option, that is, whether it expired or was exercised, and in the final column would enter his computation of profit or loss. The final column of profit or loss would not be entered until petitioner considered that the transaction had been closed. In the case of the expiration of an option unexercised, petitioner considered the transaction closed at the date of expiration of the option, and entered in the profit or loss column the amount of the premium he had received for writing the option. In the event an option was exercised, petitioner would enter an amount in the profit or loss column on the date the option was exercised *50 in each case in which a put contract was exercised. He promptly sold the stock which he was required to purchase under the put contract. Petitioner never owned the stock which he was required to sell under the call options he wrote. When a call option petitioner had written was exercised, the stock would be delivered for petitioner to the optionee by Ira Haupt & Co. If petitioner on the same date purchased stock to replace that delivered for him by Ira Haupt & Co., petitioner would consider the transaction closed on the date on which the option was exercised. In some instances petitioner would not contract to purchase the stock which had been delivered to the optionee for him by Ira Haupt & Co., but would take a "short position" with Ira Haupt & Co. on the stock. In such situations petitioner would not enter the figure of profit or loss on his ledger with respect to the option contract until the day following the day that he contracted to purchase stock to replace the stock of Ira Haupt & Co. which had been used to fulfill the option contract he had written. In some instances petitioner would wait a number of months to enter a purchase contract for the stock to replace the stock of *51 Ira Haupt & Co. which had been used to fulfill the call option. In some instances petitioner entered purchase orders the last two or three days of December, and since four days are allowed for delivery of stock under the rules of the New York Stock Exchange, the stock would not be delivered to Ira Haupt & Co. and settlement made until the first week of the following year. During 1956, 1957, and 1958 petitioner received the following amounts in premiums from put and call dealers on the number of options indicated: Number of op-
Total pre-
Year
tions written
miums received
1956
168
$53,546.50
1957
143
45,865.50
1958
101
24,501.00
Petitioner on schedule C, Profit (or Loss) from Business or Profession, of his income tax returns for 1956 and 1957 showed his principal business activity as "Dealer in Options." For 1956 he showed his gross profit on this schedule as $4,675.49 with the notation "Details of transactions at taxpayers office" and on schedule C for 1957 showed a gross profit of $12,386.20 with the same notation. For the year 1958 petitioner on schedule C of his income tax return listed his principal business activity as "Dealer in Puts & Calls" *52 and showed as his gross profit a loss of $44,848.63, again with the notation "Per details in office-Losses." On his income tax return for the calendar year 1959, on schedule C, Profit (or Loss) from Business or Profession, petitioner showed his principal business activity as "Put & Call Dealer" and showed under gross profit a loss of $54,515, without any explanation. In arriving at the gross profit or loss shown on schedule C of his returns and also for the purpose of accounting for the premiums paid to him in 1956, 1957, and 1958 in amounts as heretofore set forth petitioner made computations in the following manner: If a "put" or "call" expired without having been exercised, premiums were included as ordinary income as of the expiration date of the option. If a "call" was exercised, with Ira Haupt & Co. delivering the stock subject thereto for petitioner's account, petitioner would account on his Federal income tax returns for his profit or loss on these transactions as of the "contract date" (as contrasted to the "settlement date") on which he purchased the stock covered by the exercised "call" option. To compute the profit or loss, petitioner added together the premium he received *53 and the striking price to determine the total proceeds. From this sum, he deducted the cost of stock purchased as well as the cost of all dividends in cash or stock declared on the stock of record between the date of the exercise of the option on which according to his records he made a short sale and the date of covering by a contract to purchase, his short position. Petitioner reported the difference between the total proceeds and the total cost as ordinary income or loss. If the "put" was exercised, since the stock which had been "put" to petitioner was sold the same day, petitioner added to the premiums he received, the sum received on sale of the stock and from this total subtracted the striking price, reporting the net difference as ordinary income or loss as of the date of the sale. Of the "calls" written by petitioner, 23 were exercised in 1956. With respect to 17 out of the 23 call options exercised petitioner purchased the stock equivalent to the stock to replace that delivered by Ira Haupt & Co. under the "call" on the same day that the option was exercised. Of the "calls" written by petitioner 43 were exercised in 1957. With respect to 38 of the "call" options exercised *54 in 1957, petitioner, on the same day that the option was exercised, purchased stock to replace that delivered on his behalf by Ira Haupt & Co. to the person who exercised the option. Of the "calls" written by petitioner, 56 were exercised in 1958 and with respect to 41 of these exercised "calls" petitioner purchased stock to replace the stock delivered on his behalf to the exerciser of the "call" by Ira Haupt & Co. on the same day that the option was exercised. With respect to 11 of the remaining 26 "call" options (6 of the options exercised in 1956, 5 of the options exercised in 1957, and 15 of the options exercised in 1958), petitioner entered into contracts to purchase stock to replace the stock delivered for him by Ira Haupt & Co., which resulted in delivery of the stock to Ira Haupt & Co. before December 31, 1958. With respect to 7 of the 26 options for which stock was not purchased on the date the option was exercised petitioner entered into a contract to purchase the stock on December 29, 1958, and the settlement date with respect to such stock was in January 1959. The total loss included in the loss on schedule C of petitioner's income tax return for 1958 with respect to these *55 7 options was $30,461.99. With respect to an option for 100 shares of Servel stock which was endorsed on July 2, 1958, with an expiration date of January 12, 1959, petitioner received a premium of $150. The option was exercised on December 31, 1958, on which date petitioner entered into a contract to purchase the stock which was delivered to the holder of the option on his behalf by Ira Haupt & Co. at a cost of $1,014. The striking price received by petitioner was $883 and petitioner in computing his income on schedule C for the year 1958 included a $19 profit from this transaction. The settlement date of petitioner's contract to purchase the stock and delivery date of the stock to Ira Haupt & Co. was January 7, 1959. This contract was the only one of the 26 options which had an expiration date subsequent to December 31, 1958. The following schedule shows the number of shares of stock purchased, the name of the stock, the premium received, the striking price received by petitioner, petitioner's dividend expense, petitioner's cost to cover short position, together with the pertinent dates and amounts of ordinary loss or income reported on petitioner's income tax return for the calendar *56 year 1959 with respect to the remaining options for which petitioner did not purchase stock to return to Ira Haupt & Co. on the date the "call" option was exercised: [2]
Striking
Petitioner's
Premium
Price
Cost to
Number
received
received
Petitioner's
Cover
-of
by Peti-
by Peti-
Dividend
Short
Shares
Name of Stock
tioner
tioner
Expense
Position
100
Georgia Pacific
$ 237.50
$5,134.64
$1,050.37
$15,884.99
600
General Tire
725.00
7,032.92
485.90
24,923.37
100
Goodyear
475.00
7,996.96
1,015.59
14,854.17
200
General Dynamics
1,025.00
9,522.00
500.00
9,233.76
100
Polaroid
650.00
4,627.65
239.75
18,432.38
100
Lorillard
300.00
4,002.31
1,766.63
7,600.62
100
Lorillard
300.00
4,085.37
1,766.63
7,600.62
Ordinary
income
or (loss)
Contract
Settlement
reported
Date Pe-
Date Pe-
on Peti-
titioner
titioner
tioner's
Number
Date Op-
Expiration
Date Op-
Covered
Covered
1959 in
-of
tion En-
Date of
tion Ex-
Short
Short
come tax
Shares
dorsed
Option
ercised
Position
Position
return
100
5/11/56
6/11/56
6/11/56
12/28/59
1/4/60
($11,563.22)
600
2/ 5/57
8/14/57
8/14/57
12/28/59
1/4/60
(17,651.35)
100
10/ 5/57
1/13/58
1/13/58
12/28/59
1/4/60
(7,397.80)
200
10/ 9/57
4/18/58
4/18/58
12/28/59
1/4/60
813.24
100
12/20/57
6/30/58
5/26/58
12/28/59
1/4/60
(13,394.48)
100
2/26/58
5/26/58
4/ 2/58
12/28/59
1/4/60
(5,064.94)
100
3/ 3/58
6/ 2/58
6/ 2/58
12/28/59
1/4/60
(4,981.88)
*57 In reporting the 7 options listed with respect to which he contracted to purchase stock on December 28, 1959, on his 1959 income tax return, petitioner erroneously totaled the amount of loss as $56,902.50 instead of the correct total of $59,240.43. The total cost of the stock for which petitioner placed a purchase contract with his broker, Ira Haupt & Co., on December 28, 1959, was $98,529.91 and on that date petitioner had a credit balance with his broker of $138,107.21 in cash in addition to securities. Eight of the options written by petitioner in 1958 expired in 1959. The premiums received by petitioner with respect to these 8 options totaled $2,387.50. Generally speaking put and call dealers whose clients desired to purchase options would obtain from these clients a slightly higher *58 fee than the premium which the put and call dealer would pay to the writer of the option such as petitioner, and the portion so retained would be the put and call dealer's brokerage fee for arranging the transaction. Some of these dealers would be in regular touch with petitioner every business day and would also have other sources for writers of options. When a call on an option written by petitioner was exercised, the margin clerk at Ira Haupt & Co., would prepare a sale ticket and sell the stock covered by the call to the exerciser of the call. He would then telephone petitioner to determine whether petitioner wanted him to purchase the same stock to cover the stock furnished by Ira Haupt & Co. If in petitioner's judgment the stock looked strong, he would inform the margin clerk to forthwith purchase the stock which had been delivered to the exerciser of the option, but if in petitioner's judgment the stock looked weak, petitioner would tell the margin clerk not to purchase the stock at that time but to await petitioner's further instructions. Ira Haupt & Co. would send petitioner printed confirmation slips of sales and purchases made for his account prepared from the buy and *59 sell tickets and petitioner would receive monthly statements from Ira Haupt & Co. which included the put and call option contracts previously written by petitioner and remaining unexercised and a daily listing of each new put and call contract written by petitioner during the month as well as stock bought and sold that month in carrying out put and call contracts which were exercised by the holders. Venture Options, Inc., hereinafter referred to as Venture, was incorporated under the laws of the State of Delaware on January 23, 1959, and was qualified to do business in New York. Venture's principal business was the writing of "puts" and "calls." Petitioner was president and treasurer of Venture and was also one of its five directors. Subsequent to August 7, 1958, when petitioner wrote his last put or call option he turned his attention to promoting a corporation for the purpose of having that corporation carry on the operation of writing "puts" and "calls." Venture was the corporation that resulted from this promotion and in January 1959, petitioner purchased 40,000 shares of Venture's stock at 10 cents per share. Under date of March 2, 1959, Venture issued an Offering Circular *60 for 60,000 shares of common stock (no par value) at a price of $5 per share. The underwriter of this offer was Barsh & Co. of Passaic, New Jersey. In a footnote to the amount of underwriting commissions anticipated of $45,000, the following was stated: Under the terms of the Underwriting Agreement, sales may be made by or through the efforts of the President of the Company. On such sales, no underwriting commissions will be paid and the Company will realize the full proceeds thereof. To the extent that such sales are made, the underwriting commission will be reduced below the amount shown in the table and the proceeds to the Company will be correspondingly increased. In connection with such sales, the President may be deemed an underwriter of the shares of Common Stock offered hereunder as defined in the Securities Act of 1933. Since this is a best efforts underwriting, there is no assurance that all or any portion of the securities being offered will be sold. Accordingly, the proceeds to the Company are shown in the table on the assumption that all of said securities will be sold and, prior to the deduction of the Company's own expenses of the offering, including printing of the *61 Offering Circular and stock certificates, legal fees of counsel for the Company and counsel for the Underwriter, accounting expenses and Transfer Agent's fees, estimated not to exceed $8,500. In addition, the President of the Company has agreed to sell to the Underwriter during the term of this offering, at a price of $.01 per share, a maximum of 20,000 shares of his Common Stock on the basis of one share of Common Stock for each three shares sold by the Underwriter, except that no such right shall accrue to the Underwriter on account of sales made by or through the efforts of the President. Any shares thus purchased will be held in escrow by the Company's Transfer Agent for a period of thirteen months after the effective date of the Letter of Notification, and will be non-transferable during said period. At the request of the Underwriter, the Company will, upon the termination of the escrow, at the Company's own cost and expense, file one Letter of Notification or Registration Statement pursuant to the Securities Act of 1933, if required to qualify said shares for resale. Under "Nature of the Business" in the offering circular, Venture's business was described as that of writing *62 "puts" and "calls" and attention was called to the fact that Venture would not be engaged in the "business of dealing in or buying. PUTS or CALLS, but in the business of writing these options." In describing the management of the company, the circular listed petitioner as president, treasurer, and director. A notation was made that he might be regarded as the promoter of the company. Attention was also called to the fact that petitioner had purchased 40,000 shares of Venture's common stock at a price of 10 cents per share, that counsel for the underwriter had purchased 1,250 shares of common stock, also at 10 cents per share, and that petitioner had agreed to sell to the underwriter a maximum of 20,000 shares of common stock. This offering circular also contained the following statements under the caption, "Management and Control - Remuneration:" The Company has not entered into any employment agreement with any of its officers or directors. No salary will be paid to Mr. Reinach during the first year following this offering. Thereafter, no salary will be paid to him until the Company's operations have been established on a profit-making basis at which time a reasonable salary may *63 be paid to him as the Board of Directors, in its discretion, may determine. * * * Under "Application of Proceeds" the offering circular stated that in the event all of the securities offered were sold, the estimated proceeds to Venture would be not less than $255,000 after payment of the underwriter's commission, and that of this amount $225,000 would be deposited with member firms of the New York Stock Exchange to guarantee "puts" and "calls" written by Venture. The total outstanding shares of Venture's stock were as follows on the dates indicated: June 30, 1959
9,.350 shares
December 31, 1959
101,250 shares
June 30, 1960
101,250 shares
December 31, 1960
101,250 shares
In the first 13 months of its business of writing "puts" and "calls" Venture closed 139 "puts" or "calls" on the same day they were exercised and 58 "puts" and "calls" were not closed on the day of exercise as the covering purchase or sale of the stock subject to the option took place at a later date. During the years 1959 and 1960 petitioner's occupation as president of Venture consumed his entire working time. Petitioner wrote most of the material contained in the offering circular of *64 Venture stock, although changes were made by representatives of Barsh & Co. and by Venture's lawyers. The agreement with respect to no salary being paid to petitioner for one year was the result of negotiations between representatives of Barsh & Co. and petitioner acting on behalf of himself and on Venture's behalf as its president. During 1958 and 1959 petitioner was working on writing a pamphlet, which pamphlet was published by Venture in 1959 under the title, "An Introduction to the Option (Put and Call) Business by Anthony M. Reinach President, Venture Options, Inc." During the same years 1958 and 1959 and continuing into 1960, petitioner was engaged in writing a booklet which was published in 1961 by The Bookmailer, New York, and which is entitled, "The Nature of Puts & Calls by Anthony M. Reinach." In connection with writing this booklet petitioner made payments during 1960 to certain professional writers for advice as to how to organize and prepare the booklet as well as for editing services in connection with the booklet. In this connection petitioner also entertained certain people he knew who were editors of magazines in order to discuss with them at lunch or dinner, *65 aspects of organization of his booklet. The principal purposes of petitioner's writing the book, "The Nature of Puts & Calls," was to acquaint as many people as possible with the extent and nature of the put and call market with the hope that the result would be increased writing of "puts" and "calls" and additional business for Venture with the result that a profitable operation would result in a salary payment to petitioner as well as dividends and increased value of the Venture stock owned by petitioner. However, after publication of the book petitioner did receive some royalties from its sale. In April or May of 1960 petitioner made an agreement to transfer to one Sidney Siegel 1,650 shares of Venture stock in return for Siegel's firm providing a market for the stock of Venture. On July 25, 1960, petitioner transferred 1,650 shares of Venture stock to Sidney Siegel and 1,650 shares of Venture stock to Gertrude Krumholz. The stock was transferred at a value of $1.50 per share. In petitioner's view in order to raise capital and sell stock, as well as to dispose of personal holdings of stock, it is necessary to keep activity in the stock by having persons trade in the stock and *66 having an active trading market therein. Petitioner during the years 1959 and 1960 was a member of the City Athletic Club, the Harmonie Club, and the Quaker Ridge Golf Club. During these years he paid the following charges, dues and other fees to these clubs which were the total charges incurred by him during the years indicated at the various clubs: 1959
1960
City Athletic Club
House charges
$1,613.34
$1,165.28
Dues and other fees
438.40
479.14
Harmonie Club
House charges
368.68
702.29
Dues and other fees
625.00
755.00
Quaker Ridge Golf Club
House charges
2,142.98
2,493.26
Dues and other fees
895.00
894.00 Petitioner had been a member of the Quaker Ridge Golf Club since 1940 and was still a member of that club at the date of the trial of this case. The Harmonie Club and City Athletic Club are both located in downtown New York, and petitioner has been a member of the City Athletic Club since approximately 1946 and of the Harmonie Club since approximately 1950. During the years 1959 and 1960 petitioner entertained a number of people at the Harmonie Club and the City Athletic Club to discuss with them the writing of his book, "The Nature *67 of Puts & Calls." Petitioner also during 1959 and 1960 entertained some brokers at his various clubs and did some entertaining of brokers at the Quaker Ridge Golf Club and at places other than any of these clubs. Petitioner maintained checking accounts at the Manufacturers Trust Company and Bankers Trust Company, and during the years 1959 and 1960 he withdrew from these accounts cash in the respective amounts of $7,300 and $12,000. Petitioner used some of these amounts for entertaining business associates. At the date of the trial of this case petitioner had never received a salary or a dividend from Venture and Venture was not operating at the time because of being engaged in certain litigation which had not been completed. On February 18, 1960, an agreement on Form 870-AD which had been executed by petitioner was executed on behalf of respondent. This agreement provided for a deficiency in petitioner's income tax for the year ended December 31, 1956, in the amount of $25,616.04. This agreement contained a provision that if the proposal were accepted on behalf of respondent, "the case shall not be reopened in the absence of fraud, malfeasance, concealment or misrepresentation *68 of material fact, or an important mistake in mathematical calculation; and no claim for refund shall be filed or prosecuted for the (years) above stated other than for the amounts of overassessments shown above. * * *" On May 4, 1960, petitioner filed an Application for Tentative Carryback Adjustment in which he claimed a carryback from the calendar year 1959 to the calendar year 1956 of net operating loss in the amount of $54,525.97 and claimed a decrease in tax of $24,706.08. This claim was tentatively allowed on June 22, 1960. The $54,825.97 loss which was shown by petitioner on line 11 as his adjusted gross loss on his 1959 income tax return was arrived at by showing gross loss from business of $54,515 determined by subtracting from the total losses shown with respect to contracts on December 28, 1959, to cover stock previously delivered for petitioner by Ira Haupt & Co. to the person exercising a call option written by petitioner (which petitioner erroneously totaled as $56,902.50), the amount of $2,387.50 representing premiums received by petitioner in 1958 on options which expired unexercised in 1959. Petitioner showed his business expenses as $12,790.85 with a resulting net *69 loss of $67,305.85 which was offset by certain other income in the amount of $12,479.88, leaving an adjusted gross loss of $54,825.97. In arriving at the other income petitioner's income tax return showed a net capital loss which was used to the extent of $1,000 to reduce his income from various other sources. Of the total business expenses claimed, the amount of $12,193.40 was listed as "travel and entertainment." On his income tax return for 1960 petitioner claimed salaries as business expense in the amount of $12,595.50 of which the following payments totaling $6,520.50 were disallowed by respondent: Date Paid
Payee
Amount
May 9, 1960
Model Roland & Stone
$ 792.00
June 1, 1960
Newsfeatures, Inc.
150.00
Aug. 18, 1960
Newsfeatures, Inc.
200.00
Oct. 6, 1960
J. Barry
400.00
June 25, 1960
Siegel and Krumholz 3,300 shares of capital stock
4,950.00
of Venture Options, Inc., having an agreed value
of $1.50 per share
Unidentified payee
28.50
Total
$6,520.50 For this year petitioner claimed other business expenses in the amount of $11,927.80 without further explanation. The only adjustment made by respondent in his notice of deficiency *70 to petitioner for the year 1956 was a disallowance of the claimed net operating loss carryback which had been previously tentatively allowed. Respondent for the year 1959 adjusted the income as shown on petitioner's return by disallowing the "trading loss" of $54,515 claimed thereon and disallowing deduction of the entire amount of travel and entertainment expenses claimed by petitioner of $12,193.40 which was the major portion of the total business expenses of $12,790.85 claimed on petitioner's 1959 return, disallowing contributions of $350, and increasing petitioner's income by $2,387.50 which was explained as representing income from premiums received on the sale of "puts" which expired without being exercised. For the year 1960 respondent disallowed petitioner's claimed deduction for business entertainment expenses in the amount of $11,410.27 and salary expenses claimed as heretofore set forth, and contributions in the amount of $1,216.90 with the explanation that these claimed deductions for business entertainment expenses, salaries, and contributions had been disallowed inasmuch as petitioner had not established that they were allowable under any of the sections of the Internal *71 Revenue Code. Opinion The major issue with respect to the years 1956 and 1959 (the deficiency for 1956 results solely from respondent's determination that petitioner sustained no net operating loss in 1959 to carry back to 1956) is whether losses sustained by petitioner upon the purchase of stock to cover his short position with Ira Haupt & Co. resulting from that company's delivering stock to the optionee when a call option petitioner had written was exercised requiring petitioner to sell stock he did not own or acquire at the time the option was exercised, are deductible in computing petitioner's taxable income for 1959. The two facets of this question are: (1) Whether the loss was an ordinary loss or a capital loss, and in the alternative, (2) If the loss was an ordinary loss whether it was incurred in 1959 when the contract for purchase of the stock was entered into or in 1960 when the stock was delivered to Ira Haupt & Co. With respect to this alternative issue, petitioner points out that if the losses he claimed in 1959 occurred in 1960 when the stocks he purchased under contracts entered into in 1959 were delivered to Ira Haupt & Co., then a total loss of $30,461.99 *72 was incurred by petitioner in January of 1959, which loss petitioner had deducted in computing his income for 1958 but had not deducted in computing his income for 1959. Petitioner had also entered into contracts for the purchase of stock in the last few days of 1958, which stock had been delivered to Ira Haupt & Co. in 1959. We agree with petitioner that the facts are the same with respect to the contracts entered into on December 29, 1958, and those entered into on December 29, 1959. Therefore, the alternative issue involves a net loss of approximately $29,000, the excess of the total amount of the losses under contracts entered into on December 29, 1959, over the total amount of losses under contracts entered into on December 29, 1958. However, we do not reach the question of the year in which the loss would properly be included in income since we agree with respondent that the losses were capital losses and since petitioner reported a net capital loss on his 1959 income tax return without consideration of these losses and deducted such net capital loss to the extent of $1,000, respondent did not err in disallowing in full the losses in 1959. *73 Section 1233(a) of the Internal Revenue Code of 1954[3] provides that gain or loss from the short sale of property shall be considered as gain or loss from the sale or exchange of a capital asset to the extent that property used to close the short sale constitutes a capital asset in the hands of the taxpayer. Therefore, if the stock which petitioner contracted to buy and had delivered to Ira Haupt & Co. would constitute a capital asset in petitioner's hands, then the gain or loss from the short sale would be a capital gain or loss. Section 1221 defines capital asset as property held by a taxpayer with certain exceptions. The only one of these exceptions which petitioner contends to be applicable here is "property held by the taxpayer primarily for sale to a customer in the ordinary course of his trade or business." [4]
*74 Even though petitioner himself refers to being a writer of options, and it is clear that petitioner never sold an option which he had written but wrote options for clients of put and call brokers, petitioner argues that he was a dealer in options and that the put and call brokers were his customers. The facts do not bear out petitioner's contention. Petitioner was the writer of the option but was not a dealer either in options or in stocks covered by the options he wrote. A dealer at a minimum must buy and sell and petitioner neither bought nor sold option contracts. He contracted to buy or sell stock. The optionee under the option contract had the right to require petitioner to purchase or sell stock during the period of time provided for in the option. When an option was exercised petitioner purchased or sold the specified stock through his broker just as any other person buying or selling stock might do. Because of the extent of petitioner's activity, he might be considered a trader in stock but this does not establish that he held an inventory of stock for sale to "customers." Under the facts here shown petitioner never held for sale the stock with respect to which he wrote call *75 options. He did not own the stock when the option was written or when it was exercised but relied on his broker, Ira Haupt & Co., to deliver the stock to the optionee. However, even if petitioner had owned the stock or could be considered as owning it because of the nature of his account with Ira Haupt & Co., he would not be holding such stock for sale to "customers" in the ordinary course of his trade or business. *
In George R. Kemon, 16 T.C. 1026 (1951), we pointed out the distinction between dealers in securities who sell to customers by performing the merchandising act to bringing together buyer and seller and those sellers who perform no such merchandising function but merely sell to the customers of such a dealer or broker. Sellers of stock through dealers or brokers are traders who have no availability to a source of supply for securities different from those to whom *76 they sell. In the instant case it is questionable whether petitioner's activities in writing options would be such that he should be considered as a trader in securities. However, if the number of purchases and sales petitioner made because of options he wrote being exercised are sufficient to class petitioner as a trader in securities, this fact does not cause him to be a dealer. Petitioner argues that irrespective of whether he is classed as a dealer in securities, the losses here involved arose from his business of writing options. Petitioner states that the losses were occasioned by the writing of options and not by the short position he took when the call option was exercised. Petitioner argues that the nature of the transaction that gave rise to the loss is controlling, citing such cases as Arrowsmith v. Commissioner, 344 U.S. 6 (1952), and United States v. Gilmore, 372 U.S. 39 (1963). The point that petitioner's argument overlooks is that at best the nature of petitioner's operations as a writer of options was the holding himself out as one who would buy or sell stock through a broker. *77 It is just such traders in stock that we have held not to hold the stock they bought or sold for "sale to customers" in the ordinary course of their trade or business. Frank B. Polachek, 22 T.C. 858 (1954), and George R. Kemon, supra. Petitioner attempts to justify his contention that the transactions here in issue resulted in ordinary gain under the rationale of the Supreme Court Opinion in Corn Products Refining Co. v. Commissioner, 350 U.S. 46 (1955). In that case the Court held that under the facts there present, the purchase of corn futures contracts was a vital part of that taxpayer's manufacturing business in that it furnished a source of supply of material needed for manufacturing purposes. The gains or losses were held to arise from the everyday operation of the taxpayer's manufacturing business. The facts in the instant case bear no resemblance to those in the Corn Products Refining Co. case. Petitioner had no business in which he used the stock. The option contracts petitioner wrote were not written for the purpose of acquiring stock to use in a business. The indication from the record is that petitioner did not want to acquire *78 any stock but rather to make a profit by obtaining the premiums without being required either to acquire or sell stock. Petitioner argues that if he were in a trade or business in 1956, 1957, and 1958, the losses incurred in 1959 as a result of such business should be considered business losses. We need not consider whether petitioner's position in this respect is correct. The facts indicate that during the years 1956, 1957, and 1958, when petitioner was actively engaged in writing stock options, he did actually treat his gain or loss from the sales of stock as ordinary income or loss. This fact is not proof that this method of treatment was correct. The record in fact does not show whether treating the gains and losses as capital gains and losses would have resulted in any change in petitioner's tax liability. The years 1957 and 1958 are not before us and the year 1956 is not before us except as to the claimed 1959 net operating loss carryback. Therefore, we are not concerned with whether petitioner properly reported his income for those years. Petitioner apparently does not take issue with respondent's inclusion in his 1959 income of the $2,387.50 premiums received with respect *79 to options written in 1958 which expired at various dates between January 5 and April 15, 1959, without being exercised. However, respondent argues in detail that this is proper under Revenue Ruling 58-234, C.B. 1958-1, 279. This revenue ruling goes into extensive detail with respect to respondent's view on the proper method of reporting income by a writer of put and call options, calling attention to a number of previous rulings and the distinction in the provisions of section 117(g)(2) of the Internal Revenue Code of 1939 and section 1234(a) of the Internal Revenue Code of 1954 with respect to gains from the failure to exercise a put or call option. [5] Petitioner states that he did compute his income in accordance with respondent's ruling. We do not deem it necessary to discuss the validity of respondent's ruling or the various positions of respondent stated therein since both parties apparently agree that the $2,387.50 was income to petitioner in 1959 and we have no issue presented in this respect in this case. *80 Respondent's primary contention with respect to his disallowance of deductions of business expenses claimed by petitioner in 1959 and 1960 is that petitioner has not shown that he was in any trade or business and that petitioner has failed to show that some amounts disallowed were not expenses which properly should have been paid by Venture. Petitioner contends that the expenses were incurred in his trade or business of being president of Venture and in the alternative that these expenses were incurred in a transaction entered into for profit. The evidence does support petitioner's position that insofar as the expenses have been shown to be incurred to put Venture into a position to operate on a profitable basis they were incurred to some extent as business expenses in his business of being president of Venture. See Harold Haft, 40 T.C. 2 (1963). The expenses have also been shown to have been incurred to some extent in a transaction entered into for profit in that petitioner was attempting to place Venture on a profitable basis so that he would be paid a salary. Cf. Eugene H. Rietzke, 40 T.C. 442, 452 (1963). Petitioner was not to be paid a salary until *81 Venture was a profitable operation even though he devoted his full time to being its president. The difficulty with the record is the vagueness of the evidence to establish what portion of the expenditures which respondent disallowed was ordinary and necessary business expenses or ordinary and necessary expenses in a transaction entered into for profit. Petitioner's own testimony is that the agreed amounts of payments to various clubs included his total bills at those clubs and it is clear from the record that petitioner used these clubs for personal as well as business reasons. There is no precise evidence as to the amount of cash expenditures made by petitioner for business purposes, merely petitioner's statement that he thought he spent only about $2,500 of the cash withdrawn from his bank account for personal expenses in each of the years 1959 and 1960. With respect to the amounts disallowed by respondent which were claimed as salary payments in 1960, petitioner has failed to show that the amount of over $6,000 of the claimed deduction for salaries which respondent did not disallow did not include any amount of salary payments which he made in connection with the writing of *82 his book which might be considered to be deductible expenses. We therefore sustain respondent in his determination disallowing a portion of the deduction claimed by petitioner in 1960 as salaries paid. The disallowance of the amount of $4,960 representing stock of Venture at a value of $1.50 per share which petitioner transferred to Sidney Siegel and Gertrude Krumholz is not fully explained in the record. There is no evidence in the record as to the reason for the transfer of the stock to Gertrude Krumholz. The reason for the transfer to Sidney Siegel is shown to be in return for his assistance in keeping active trading in Venture's stock. The evidence shows that petitioner reserved the right to make sales of Venture's stock and on such sales no underwriting commissions would be paid. To a certain extent petitioner was acting as an underwriter of Venture's stock. Petitioner was the promoter of Venture and it was necessary for Venture to operate profitably before petitioner would be paid a salary by that corporation. Under these circumstances, we agee with petitioner that he has shown that the transfer of the 1,650 shares of stock to Sidney Siegel was an expenditure in a transaction *83 entered into for profit and so hold. Respondent disallowed all or substantially all of the amounts claimed by petitioner for entertainment expenses in 1959 and 1960. The record shows that some of these amounts was spent by petitioner in an effort to promote the business of Venture in a manner expected of a corporate president. The record also shows that petitioner was not to be reimbursed for these expenditures. From the vague evidence in the record it is difficult to determine the amount of expenditures petitioner actually made in entertaining in connection with his position as president of Venture. However, there is sufficient evidence to show that there were some such expenditures which were ordinary and necessary business expenses. Therefore, weighing heavily against petitioner upon whom rests the burden of proof, we have concluded that in each of the years petitioner is entitled to a deduction for entertainment expenses to the extent of $3,000. We therefore sustain respondent in his disallowance of travel and entertainment expenses in the years 1959 and 1960 except to the extent of $3,000 in each of these years. Petitioner offered no evidence and apparently does not contest *84 the disallowance of claimed deductions for contributions or travel in 1959 and 1960. Petitioner cites a number of District Court cases which have held to the effect that a taxpayer is bound by his agreement on a Form 870-AD not to file a claim for refund of taxes for the taxable year covered by the agreement. The cases cited have varying rationale, but all tend to be in the nature of estoppel. It is petitioner's position that since the respondent on the Form 870-AD agreed not to reopen his tax liability for 1956 except for fraud, misrepresentation or mathematical error, respondent should be barred from determining a deficiency in petitioner's income tax for that year. Petitioner's income tax for that year. Petitioner's argument in this regard is in the nature of estoppel which petitioner has not specifically pleaded as is required. However, under the facts here, respondent was clearly not barred from determining the deficiency resulting from the disallowance of the tentatively allowed net operating loss carryback. Petitioner's application for the net operating loss carryback was filed several months after the execution by petitioner and respondent of the agreement Form 870-AD. This *85 agreement was signed on behalf of respondent even before petitioner's return for 1959 was due to be filed. There is nothing in the agreement on Form 870-AD that indicates that either party was bound thereby with respect to a net operating loss carryback deduction for a loss incurred in any year subsequent to 1956. Petitioner, in applying for the tentative carryback adjustment, showed his interpretation of the agreement to be that he was not barred thereby from claiming a net operating loss carryback adjustment. Since petitioner's claimed net operating loss carryback was tentatively allowed after execution of the agreement on Form 870-AD, respondent is not barred from disallowing the carryback previously allowed, whether or not he might, under other circumstances, be barred from determining a deficiency. We need not therefore consider to what extent, if any, respondent would be barred by such an agreement from making adjustment in the taxable income of a taxpayer for the year covered by the agreement. Decision will be entered under Rule 50. Footnotes
1. The stipulation recites this fact. However, the testimony shows that petitioner was employed by Ira Haupt & Co., beginning in 1946, became a partner in 1950, and remained a partner until March 29, 1956.↩
2. The parties evidently included the 100 shares of Servel stock with respect to which the option was exercised on December 31, 1958, and petitioner contracted on that same date to purchase the stock, as being one of the 15 options written in 1958 which was not covered by stock on the day it was exercised since the schedule stipulated by the parties contains only 26 items including this one.↩
3. All references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
4. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *↩
*. An official Tax Court order dated 12/21/65 and signed by Judge Scott deleted a sentence at this point which read "The purchasers of the stock were the 'customers' of the broker, Ira Haupt & Co."↩
5. Sec. 117(g) (I.R.C. 1939). Gains and Losses from Short Sales, etc. - For the purpose of this chapter - * * *
(2) gains or losses attributable to the failure to exercise privileges or options to buy or sell property shall be considered as short-term capital gains or losses; and * * *
Sec. 1234(a) (I.R.C. 1954↩). Treatment of Gain or Loss. - Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, a privilege or option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option or privilege relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him.)